**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Arturo GONZALEZ and Ricardo
Ramirez, Defendants–
Appellants.**

Nos. 95–2297, 95–2298.

United States Court of Appeals,
Seventh Circuit.

Argued June 7, 1996.

Decided Aug. 14, 1996.

Barry Rand Elden, Chief of Appeals, Alan Grossman (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for United States of America.

David D. Reyes, Gerardo Gutierrez (argued), Chicago, IL, for Arturo Gonzalez.

Joseph R. Lopez, Gerardo S. Gutierrez (argued), Chicago, IL, for Ricardo Ramirez.

Before POSNER, Chief Judge, FLAUM and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

After a six-day trial, Arturo Gonzalez and Ricardo Ramirez were convicted on the three counts with which they had been charged: conspiracy to possess with intent to distribute and to distribute heroin (21 U.S.C. § 846); possession of heroin with intent to distribute (21 U.S.C. § 841; 18 U.S.C. § 2); and using and carrying a firearm during and in relation to the commission of drug trafficking crimes (18 U.S.C. § 924(c)). The defendants' first motion for a new trial was denied. However, when the defendants filed a supplemental posttrial motion for new trial, based on newly discovered evidence concerning the confidential informant who had participated in their apprehension and testified at trial, the court granted additional discovery and required full briefing by the parties. On February 9, 1995, however, the court denied the request for new trial.

Mr. Gonzalez and Mr. Ramirez appeal the denial of their supplemental motion for new trial on the ground that the government's failure to disclose information about the confidential informant denied them due process of law. They also assert that the evidence supporting their convictions for use of a firearm during a drug transaction, under 18 U.S.C. section 924(c), is insufficient as a matter of law after *Bailey v. United States*, ⸺ U.S. ⸺, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). For the reasons that follow, we affirm in part and reverse and remand in part.

# I

## BACKGROUND

### A. *Facts*

#### 1. Trial evidence

Defendant Ricardo Ramirez had known Jose Varela for fifteen years, but did not know that Varela had become a government informant.[2] In October 1991, Mr. Ramirez went to Varela's home and agreed to put Varela in touch with some friends of his who sold heroin. Through November 1991, Mr. Ramirez and Varela continued discussing and planning the narcotics transfer but never brought it to fruition. During this period, Varela, operating as the agents from the Drug Enforcement Agency ("DEA") had instructed him, recorded secretly his conversations with Mr. Ramirez.

Mr. Ramirez's arrangements for a heroin sale seemed to fall in place in late November. On November 27, 1991, Mr. Ramirez handed Varela "a little piece of cloth" (Tr. III at 21) which was a twenty-six gram sample of heroin. On December 21, 1991, Varela and undercover agent Rafael Tovar, posing as Varela's buyer, met Mr. Ramirez at a McDonald's restaurant in Chicago to purchase a larger quantity of heroin. Both Tovar and Varela were wearing transmitters that recorded their conversations. Because Mr. Ramirez said he could not reach his supplier, however, the deal fell through. Tovar showed Mr. Ramirez $60,000 in cash he had brought for the purchase and told Mr. Ramirez not to call again until he actually had the heroin.

On January 30, 1992, Mr. Ramirez told Varela that he had thirteen "real good" "Mexican females" (Tr. III at 53), a reference that Varela interpreted to mean thirteen ounces of high quality heroin. The next day the three men met again at McDonald's. Again Tovar and Varela wore recording devices. While Tovar waited in the car, Varela and Mr. Ramirez arranged the meeting for the heroin purchase. Later that day, Varela and Tovar signalled Mr. Ramirez by pager. Shortly afterwards Mr. Ramirez arrived; he then took Varela to his basement apartment to show him the heroin. On their walk over to Mr. Ramirez's apartment, Varela mentioned that his buyer carried a weapon because he had been cheated in the past. Mr. Ramirez replied that he too had a firearm whenever he carried drugs or money. In that apartment, Varela met Mr. Gonzalez for the first time. Varela secretly recorded the conversations. Mr. Ramirez showed Varela one-ounce black chunks of what seemed to be heroin, individually wrapped in a plastic bag. Varela went back to McDonald's to report to Tovar that the heroin was available.

After Varela left, Mr. Ramirez and Mr. Gonzalez emerged from the building and hid the plastic bag of heroin in a trash can across the alley. They then investigated the alley and the area in front of his house. Once Mr. Ramirez had scanned the entire area, he gave a hand signal to Mr. Gonzalez. Mr. Ramirez then walked back to the alley, retrieved the plastic bag from the garbage can, and reentered his building. DEA surveillance agents observed this countersurveillance activity.

Varela did not return to Mr. Ramirez's building alone; instead, Tovar came with him to see the heroin. When they arrived, Mr. Ramirez led them to the basement apartment and introduced Tovar to Mr. Gonzalez. On the table was a pager; the number on it was the one Tovar and Varela had called earlier that day. Mr. Gonzalez directed Tovar to a chair facing him. Mr. Ramirez then handed Tovar a small plastic bag and sat down on a couch, also facing Tovar. Tovar inspected the sample package; it contained a dark, rocklike substance that appeared to be a chunk of heroin. When Tovar asked to see the rest of the heroin, Mr. Gonzalez nodded to Mr. Ramirez. Mr. Ramirez then reached under a blanket on the couch, took out a blue bag and handed it to Tovar. Mr. Ramirez resumed his position on the couch facing Tovar. Tovar inspected the bag, which appeared to contain more heroin. He then sent Varela to get the money. After Varela left, however, Tovar activated an electronic arrest

---

**2.** Varela was arrested in June 1991 on a narcotics transaction charge. He agreed at that time to become an informant for the government.

signal. DEA agents arrived and placed Mr. Ramirez and Mr. Gonzalez under arrest. In the apartment were found the pager and a loaded twelve-gauge shotgun, with the safety off, concealed under a blanket on the couch on which Mr. Ramirez had been sitting. The shotgun was pointed at the chair in which Tovar had been sitting.

Following a six-day trial, the jury found the two defendants guilty of all counts in the indictment.

### 2. Post-trial evidence

A week before sentencing, one of the defense attorneys received anonymously two documents—a statement by a special agent of the Bureau of Alcohol, Tobacco and Firearms, and a report by a DEA special agent—concerning confidential informant Varela's involvement in illegal activities. The government subsequently produced other undisclosed reports concerning Varela.[3]

The defendants sought a new trial because the undisclosed impeachment evidence, favorable to the defense, was relevant and material to the issue of Varela's credibility as a key government witness against the defendants.[4] Moreover, the reports had existed before their trial began. According to the defendants, the government's failure to disclose this additional material on Varela prior to trial constituted a violation of the government's obligation to disclose impeaching evidence under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

3. The government claims that, although the additional reports regarding Varela had existed prior to the trial of Mr. Ramirez and Mr. Gonzalez, the government attorney was not aware of the materials at that time. The reports were received while the government was preparing for a trial in another case.

4. The documents included evidence of impeachment by inconsistent statement and bias or benefit, evidence of other crimes, and instances of dishonesty and false statements. According to the defendants, the evidence specifically included perjury (various reports reflecting evidence of Varela's activities that contradicted his trial testimony), allegations of murder, large cocaine shipments, false statements and names given by him,

### B. *District Court Post–Trial Ruling*

In its consideration of the defendants' *Brady* motion for a new trial, the district court examined in detail the evidence of record. R.127 at 1–13. When analyzing the information about Varela received just before sentencing, the court determined which of the documents would have been ruled admissible under Rule 608(b) of the Federal Rules of Evidence on the ground that the evidence presented in them was probative of Varela's character for truthfulness or untruthfulness.[5] *Id.* at 14–16. Of all the undisclosed material, the court noted, none was exculpatory. Its only value to the defendants was that it cast doubt on Varela's credibility. The court then noted that the informant's credibility had been undermined throughout the trial:

> However, Varela's credibility was already suspect. At trial, Varela admitted he was a drug dealer. He admitted that he sold multiple-kilogram quantities of cocaine. In fact, he was unable to deny that he had dealt as much as 400 kilograms of cocaine. Varela admitted his interest in testifying for the prosecution, i.e., that for his cooperation he received a substantial reduction in jail time and hoped to receive a further reduction. He admitted that he signed a financial affidavit that contained false information. He admitted that he stole tools from his former employer. He admitted that he attempted to persuade an undercover agent to steal as much as 35 kilograms of cocaine from a drug house. He admitted that he would on occasion lie to further his drug business. In closing argument, the government admitted

and contradictory testimony at trial regarding drug-related involvement and quantity of narcotics.

5. The district court found that the undisclosed material that probably would have been admissible included reports containing evidence of Varela's false denials (of his knowledge of illegal activities at Stone Park apartments and of his involvement in drug trafficking, for example), his 1987 burglary conviction and criminal history record reflecting his aliases. The defendants do not challenge this admissibility determination. *See United States v. Silva,* 71 F.3d 667, 670 (7th Cir.1995) (noting that evidence inadmissible at trial could not have affected the trial outcome and thus could not give rise to a *Brady* violation).

that Varela was a "cheater," a "liar," and a "drug dealer." The government asked the jury to believe Varela only when his testimony was corroborated.

R.127, Memorandum Opinion and Order of February 8, 1995, at 17. The district court concluded that the newly discovered evidence, even if admitted and viewed in its entirety, would not have weakened Varela's credibility to the point that the jury probably would have acquitted the defendants—because there was independent evidence of the guilt of Mr. Gonzalez and Mr. Ramirez. "[T]he fact remains that [Varela's] testimony bearing on the guilt or innocence of the defendants was corroborated, almost completely, by the tapes and by Agent Tovar, who was present at the heroin transaction." *Id.* at 18.

The district court also considered the contention that the defendants would have been more likely to pursue an entrapment defense if they had additional material with which to impeach Varela. *Id.* at 20. After reviewing the undisclosed material in light of this argument, the court determined that there was no evidentiary support for an entrapment defense. It held therefore that there was no reasonable probability that the result of the trial would have been different had the undisclosed impeachment material been disclosed prior to trial. *Id.* at 21.

## II

## DISCUSSION

### A. *Denial of Motion for New Trial*

■ Rule 33 of the Federal Rules of Criminal Procedure states: "The court on motion of a defendant may grant a new trial to that defendant if required in the interests of justice." The rule commits the decision to the sound discretion of the trial judge. *See United States v. Williams*, 81 F.3d 1434, 1437 (7th Cir.1996); *United States v. Maloney*, 71 F.3d 645, 654 (7th Cir.1995), *petition for cert. filed*, —— U.S.L.W. —— (U.S. July 12, 1996) (No. 96–73); *United States v. Theodosopoulos*, 48 F.3d 1438, 1448 (7th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 191, 133 L.Ed.2d 128 (1995). As a reviewing court, "[w]e approach such motions with great cau-

tion and are wary of second-guessing the determinations of both judge and jury." *United States v. DePriest*, 6 F.3d 1201, 1216 (7th Cir.1993). We must consider whether the district court's determination was reasonable in holding that the defendants "had not been denied a fair trial by the totality of the government's misconduct." *Williams*, 81 F.3d at 1438.

■ A defendant relying on newly discovered evidence as the basis for his motion for a new trial must show that the evidence (1) came to his knowledge only after trial; (2) could not have been discovered sooner had due diligence been exercised; (3) is material and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a new trial. *United States v. Severson*, 49 F.3d 268, 271 (7th Cir.1995); *United States v. Kamel*, 965 F.2d 484, 490 (7th Cir.1992). The defendants in this case claim that the government's failure to disclose before trial all the impeaching evidence within its possession concerning confidential informant Varela constituted a violation of the requirements of *Brady* and *Giglio*.

### 1.

■ One of the central tenets of our criminal law jurisprudence is the prosecution's affirmative duty to disclose evidence favorable to a defendant and material either to the issue of guilt or to the issue of punishment. In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court set forth the basic principle that the prosecution violates due process by suppressing favorable evidence that is material either to the guilt or to the punishment of the accused, "irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. In *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Court extended the *Brady* rule by holding that the prosecution violates due process by suppressing information concerning the reliability of a key witness when such impeachment evidence would be material to guilt or innocence. *Id.* at 154, 92 S.Ct. at 766. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), fo-

cused on the materiality of the undisclosed evidence: Favorable evidence is material if "its suppression undermines confidence in the outcome of the trial." *Id.* at 678, 105 S.Ct. at 3381. And *Kyles v. Whitley,* —— U.S. ——, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), reviewed further the meaning of materiality as it relates to the final result of the trial:

> *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the Government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id.* at ——, 115 S.Ct. at 1566 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381).

We must determine, therefore, whether the government's failure to disclose evidence favorable to the defendants deprived those defendants of a fair trial under *Brady* by considering whether there is a reasonable likelihood that its nondisclosure would have affected the judgment of the jury and thus undermines confidence in the verdict. *See Williams,* 81 F.3d at 1438; *United States v. Boyd,* 55 F.3d 239, 245 (7th Cir.1995) (asking "whether there is a reasonable probability that, had it not been for the improprieties, the defendants would have been acquitted").

### 2.

■ After reviewing the entire record including, of course, the undisclosed materials, we conclude that the district court did not abuse its discretion in determining that the withheld evidence was not material. The

government produced, prior to trial, a quantity of impeachment materials.[6] At trial Varela admitted to a wide range of illegal activities, such as selling multiple-kilogram quantities of cocaine (perhaps as much as 400 kilograms), signing a false financial affidavit, stealing tools from his former employer, and lying to further his drug business. Varela also had admitted that he had received a substantial reduction in jail time for his cooperation and hoped to receive a further reduction. *See* R.127 at 17. In its closing argument, the government stated that Varela was a "cheater," "liar," and "drug dealer," and told the jury not to believe Varela unless there was other evidence—namely, the taped conversations—to corroborate his word. Tr. IX at 18–19.

There was indeed other evidence of Mr. Ramirez's and Mr. Gonzalez's drug dealings. The jury was read numerous transcripts of the recorded discussions that Mr. Ramirez had with Varela and Tovar, conversations that clearly established Mr. Ramirez's efforts to broker and to negotiate a heroin deal. In addition, Agent Tovar testified in detail about his meetings with Mr. Ramirez on December 21, 1991, and again on January 31, 1992, and about the heroin transaction on January 31 with both defendants present. His testimony clearly established that Mr. Ramirez and Mr. Gonzalez were knowingly involved in the drug sale. Other DEA agents also offered testimony concerning their surveillance observations and, in particular, the countersurveillance movements of Mr. Ramirez and Mr. Gonzalez before Agent Tovar arrived to purchase the heroin from them. This evidence would have been sufficient to sustain the conviction of each defendant independent of the testimony of Varela.

Of course, ultimately, sufficiency of the evidence is not the "touchstone" under the *Brady* line of cases. *Kyles,* —— U.S. at ——

---

**6.** The materials about Varela that were turned over to the defendants prior to trial include: (1) Varela's plea agreement, in which he pled guilty to conspiring to distribute multi-kilogram quantities of cocaine; (2) a letter from the U.S. Attorney stating his intention to request a further reduction of Varela's sentence; (3) Varela's informant payment record, totalling $10,550; and (4) a DEA report listing Varela's admissions to (a) distributing, purchasing and attempting to purchase multi-kilogram quantities of cocaine, and (b) repeatedly attempting to persuade an undercover agent to "rip off" as much as 45 kilograms of cocaine from another drug dealer. The court notes that there were other materials disclosed by the prosecution as well. *See* R.127 at 7–8 and n. 2.

n. 8, 115 S.Ct. at 1566 n. 8. Rather, it is the "reasonable probability" of a different result:

The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the Government's evidentiary suppression "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381.

*Id.* at ——, 115 S.Ct. at 1566. In this case, the district court "evaluate[d] the tendency and force of the undisclosed evidence item by item," *id.* at —— n. 10, 115 S.Ct. at 1567 n. 10, and determined that, even though the additional evidence reflected more drug dealings, crimes and lies on Varela's part, none of it was exculpatory to these defendants. It then considered the evidence cumulatively, *see id.* at ——, 115 S.Ct. at 1567 (requiring that materiality be defined in terms of the collective effect of suppression), and determined that it was not material to the guilt of Mr. Ramirez and Mr. Gonzalez. Put in terms of the "touchstone," the court determined that there was not a reasonable probability that the result of the trial would have been different if the material had been disclosed to the defense or presented to the jury. *Id.* at ——, 115 S.Ct. at 1566; *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381; *see also United States v. Silva*, 71 F.3d 667, 670 (7th Cir.1995); *United States v. Sanchez–Galvez*, 33 F.3d 829, 833 (7th Cir.1994).

The defendants also contend that, had this additional information about Varela been available prior to trial, they might have pursued an entrapment defense or plea agreement. They submit that Varela had been under pressure to produce evidence for the government and therefore that he set up his friend Ramirez, who owed him a substantial amount of money. The district court found no merit to the entrapment argument. It noted that the defendants already had a significant amount of impeaching material prior to trial and could have used the newly disclosed evidence at sentencing. Moreover, the court believed that, had the jury been presented with more evidence of Varela's prior drug dealing (which made up the major portion of the newly discovered evidence), it would have seen that Mr. Ramirez's longtime association with Varela made it more likely that Mr. Ramirez himself was involved in other drug transactions. We cannot disturb the district court's assessment of the impeachment evidence and its possible use by the defendants.[7]

We conclude that the district court did not abuse its discretion in denying the motion for new trial. Because there is independent corroborating evidence of the guilt of Mr. Ramirez and Mr. Gonzalez, there is no reasonable probability that the result of the trial would have been different had the undisclosed impeachment material been disclosed prior to trial. Even if the additional impeachment material could have made the informant Varela less credible in the eyes of the jury, there was no evidence of entrapment and ample evidence that both defendants engaged willingly in the drug transaction.

B. *Sufficiency of the Conviction under 18 U.S.C. Sec. 924(c)* [8]

Count III of the indictments against Mr. Ramirez and Mr. Gonzalez charged that, on January 31, 1992, the defendants "used or carried a firearm, namely a 12 gauge shotgun, during and in relation to drug trafficking crimes." R.12. The evidence at trial

---

7. We note in passing that Varela's "sordid past" has been the subject of another appeal, *United States v. Silva*, 71 F.3d 667 (7th Cir.1995). In that case the district court did not believe there was a reasonable probability that disclosure of Varela's identity as confidential informer would have supported an entrapment defense and therefore would have changed the trial outcome. We affirmed that court's denial of a new trial on that basis.

8. 18 U.S.C. § 924(c) provides, in pertinent part:

(c)(1) Whoever, during and in relation to any crime of violence or drug trafficking crime . . . for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years. . . .

established that, on January 31, 1992, the defendants distributed approximately thirteen ounces of heroin to undercover agent Tovar. During that drug deal, Mr. Ramirez was sitting on a couch on top of a blanket. Beneath the blanket was concealed the bag of heroin delivered to Tovar and a loaded 12 gauge shotgun, with its safety off, which was aimed at the undercover agent.

The jury was instructed solely on the "use" prong of section 924(c). The instruction, in pertinent part, states:

> In Count Three of the indictment, the defendants are charged with using firearms during and in relation to the commission of any drug trafficking crimes. Title 18, United States Code, Section 924(c)(1) provides in pertinent part:
>
> > Whoever, during and in relation to any ... drug trafficking crime ... uses ... a firearm [violates this section.]
>
> * * * * * *
>
> As used in these instructions, the word "uses" means that a firearm was knowingly within the possession or control of the defendant whose case you are considering and that the firearm was there as a means of protection and to increase the likelihood of success of the offense charged in Count One or Two of the indictment. The government is not required to prove that the defendant whose case you are considering fired, brandished, or otherwise displayed the firearm in order to prove use of a firearm.

R.74 at 32–34. There was no objection raised to this instruction. The jury charge was consistent with the definition of "use" of a firearm approved in our circuit prior to the Supreme Court decision in *Bailey v. United States*, —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). However, the Supreme Court's narrowing of the definition of "use" in *Bailey* has rendered the instruction erroneous. The jury found the defendants guilty of violating 18 U.S.C. § 924(c)(1) as charged in Count III.

### 1.

Section 924(c) provides for a five-year term of imprisonment for anyone who "uses or carries a firearm" "during and in relation to any ... drug trafficking crime." Prior to the Supreme Court's interpretation of the term "use" in *Bailey*, our circuit had defined broadly the "use" of a firearm in connection with a narcotics transaction. The pre-*Bailey* law of our circuit was "that evidence that a firearm was within the possession or control of a coconspirator during the commission of a drug trafficking crime, or that a firearm was kept in strategic proximity to narcotics destined for distribution, was sufficient to allow a jury to conclude that the defendant had violated the 'use' prong of § 924(c)(1)." *United States v. James*, 79 F.3d 553, 553–54 (7th Cir.1996) (reversing section 924(c) conviction following remand from Supreme Court for further consideration in light of *Bailey*).

In *Bailey*, however, the Supreme Court rejected the interpretation of "use" as mere possession or storage of a firearm. —— U.S. at ——, 116 S.Ct. at 508. It held that the conviction of a defendant for "use" of a firearm demands proof that the firearm was "actively employed" in the predicate offense. *Id.* at —— – ——, 116 S.Ct. at 505–06. Active employment "certainly includes brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." *Id.* at ——, 116 S.Ct. at 508. "Use" also includes a coconspirator's "reference to a firearm" or the "silent but obvious and forceful presence of a gun on a table," *id.*, for those active employments are intended as threats or coercions calculated to bring about the narcotics transaction. However, "use" does not include the placement of a weapon nearby for later use:

> A possibly more difficult question arises where an offender conceals a gun nearby to be at the ready for an imminent confrontation. Some might argue that the offender has "actively employed" the gun by hiding it where he can grab and use it if necessary. In our view, "use" cannot extend to encompass this action. If the gun is not disclosed or mentioned by the offender, it is not actively employed, and it is not "used." To conclude otherwise would distort the language of the statute as well as create an impossible line-drawing prob-

lem. How "at the ready" was the firearm? Within arm's reach? In the room? In the house? How long before the confrontation did he place it there? Five minutes or 24 hours? Placement for later active use does not constitute "use."

*Id.* at ———————, 116 S.Ct. at 508–09.

The government concedes that the conviction cannot stand because the jury instruction employed the pre-*Bailey* definition of "use." It further admits that, in light of *Bailey*'s statement that a concealed gun "at the ready" is not "used," these defendants probably did not "use" the firearm. However, the government seeks a remand of the case for retrial on Count III on the theory that the defendants "carried" rather than "used" the shotgun. According to the government, the facts established at trial permit the inference that the two defendants set up the small one-room basement apartment for the drug sale immediately prior to its occurrence: They loaded the shotgun, moved the safety off, placed the shotgun and bag of heroin beneath the blanket, and pointed the gun at the chair where the prospective purchaser would be sitting. These activities, the government submits, could allow a jury to conclude that the defendants satisfied the "carry" prong of section 924(c). The government therefore seeks to retry the defendants on the section 924(c) charge on that theory.[9]

The defendants, on the other hand, contend that their convictions for violation of section 924(c)(1) should be reversed in light of *Bailey.* They submit that the government did not prove "use." The fact that the muzzle of a loaded shotgun, hidden under a blanket, was facing in the direction of an agent, in itself, cannot justify the "use" prong of the offense. According to Mr. Ramirez and Mr. Gonzalez, there is no testimony that either defendant had touched, brandished, displayed the weapon. There is no evidence that the weapon was seen or alluded to or that either defendant reached underneath the blanket. In fact, there is no reference to a weapon "calculated to bring about a change

in the circumstances of the predicate offense." *Bailey,* —— U.S. at ——, 116 S.Ct. at 508. For these reasons, the defendants urge this court to find that there was insufficient evidence to satisfy the "use" element of section 924(c)(1) and, on that ground, to set aside the conviction on Count III.

2.

In the aftermath of *Bailey,* we have been confronted with the task of evaluating cases that were originally adjudicated under the pre-*Bailey* understanding of the scope of the statute's prohibition against the "use" of a firearm "during and in relation to a crime of violence or drug trafficking crime." As Chief Judge Newman, writing for the Court of Appeals for the Second Circuit, has noted, these cases arise in one of two contexts, as challenges to the validity of the instruction or as challenges to the sufficiency of the evidence. *United States v. Vasquez,* 85 F.3d 59, 60–61 (2nd Cir.1996). In this case, we are confronted with the problem in the context of a challenge to the sufficiency of the evidence and therefore shall analyze the submission of the defendants in those terms.

a.

 We review a challenge to the sufficiency of the evidence by viewing the evidence presented at trial in the light most favorable to the prosecution. We shall uphold the conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Baker,* 78 F.3d 1241, 1245 (7th Cir.1996). In this case, although the indictment charged the defendants under both the "use" and "carry" prong of section 924(c), the jury was instructed only on the "use" prong, and the government concedes that there was no "use." Despite the government's concession that the conviction on Count III should be vacated, we have a duty to give the matter our independent review. *See Sibron v. New York,* 392 U.S. 40, 58, 88 S.Ct. 1889, 1900, 20

---

9. In the event that the defendants are not retried, or that, after retrial, either defendant is acquitted on the § 924(c) charge, the government seeks to resentence the defendants on Counts I and II of the indictment. If that contingency occurs, it

would like the district court to consider applying § 2D1.1(b)(1) of the United States Sentencing Guidelines, which provides for an upward enhancement when a firearm is possessed during a drug offense.

L.Ed.2d 917 (1968) ("Confessions of error [on the part of a state district attorney] are, of course, entitled to and given great weight, but they do not 'relieve this Court of the performance of the judicial function.'") (quoting *Young v. United States*, 315 U.S. 257, 258, 62 S.Ct. 510, 511, 86 L.Ed. 832 (1942)); *see also Vasquez*, 85 F.3d at 60 (citing cases).

### b.

■ Section 924(c) allows a conviction on either of two alternative grounds, "using" or "carrying" the firearm. The indictment in this case charges the defendants with commission of an offense by either of those two means—using or carrying a firearm during and in relation to the predicate crime. It is settled law that a general verdict is valid and will not be set aside as long as the evidence supporting one of the possible bases for conviction submitted to the jury is legally sufficient. *Griffin v. United States*, 502 U.S. 46, 49, 112 S.Ct. 466, 469, 116 L.Ed.2d 371 (1991). However, if the jury was instructed incorrectly with respect to one of the possible bases of conviction and there exists the possibility that the jury was misled by that error in the statement of the law, the verdict cannot stand. In this second situation, *Griffin*, on the basis of established precedent, counsels that a verdict ought to be set aside and the case remanded if "the verdict is supportable on one [legal] ground, but not on another, and it is impossible to tell which ground the jury selected." *Id.* at 52, 112 S.Ct. at 470–71 (quoting *Yates v. United States*, 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)).[10]

### 3.

This case, like the others that have come to this court in the post-*Bailey* era, presents the second of the two situations we have just described. In these cases, the jury was not instructed correctly with respect to one prong of the offense—the use prong. Therefore, it is necessary to determine whether the jury's verdict could have rested on the instruction, "correct" when given under the prevailing law of the circuit, but now erroneous under the holding in *Bailey*. Here, our starting point must be the command of *Yates*, 354 U.S. at 312, 77 S.Ct. at 1073, that the conviction cannot stand if "the verdict is supportable on one [legal] ground, but not on another, and it is impossible to tell which ground the jury selected."

Our analysis must also be informed, however, by the rules that govern our assessment of erroneous jury instructions. Those rules are set forth in detail in *United States v. Holmes*, 93 F.3d 289 (7th Cir.1996), decided today. Basically, we note in that opinion that the Supreme Court has made it clear that the error in a jury instruction, even when it deals with the elements of the offense, is not necessarily fatal when the error did not infect the jury's determination. We think the principles set forth in that opinion are just as relevant when the litigant chooses to cast his submission to the court in terms of sufficiency of the evidence rather than instructional error.

The rule in *Yates* is therefore tempered by the fact that not all errors in jury instructions dealing with the elements of the offense are fatal. Indeed, in a rare section 924(c) case, it is possible to affirm the judgment of conviction despite the erroneous jury instruction with respect to "use" because the evidence clearly shows that the defendant both used and carried the firearm. For example, in *United States v. Booker*, 73 F.3d 706 (7th Cir.1996) (per curiam), we held that it was

---

**10.** *Griffin* defines "legal error" as "a mistake about the law, as opposed to a mistake concerning the weight or the factual import of the evidence." 502 U.S. at 59 (distinguishing between *Yates v. United States*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), and *Turner v. United States*, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970)). The Court reasoned that jurors "are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law," but "are well equipped to analyze the evidence" and to convict on the ground supported by adequate evidence. *Id.* *Griffin* concludes that a jury instruction presenting alternative bases of liability, one of which does not have adequate evidentiary support, does not provide an independent basis for reversing an otherwise valid conviction. *Id.* at 60, 112 S.Ct. at 474–75.

proper to uphold the defendant's conviction under section 924(c). The evidence in that case revealed that, upon being stopped by police, the defendant was sitting in the rear seat of a van and emptying his pockets onto the van floor. A search of the van floor and the defendant's person revealed a firearm, ammunition, cash, drugs and drug paraphernalia. The defendant admitted carrying the firearm during a drug transaction, thus establishing liability under the "carry" prong of section 924(c). Furthermore, the defendant conceded that his conduct had amounted to a "use" of the weapon as that term was defined by the Supreme Court in *Smith v. United States*, 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993). Because the defendant's admissions necessarily established "use" as well as "carry," the defendant's section 924(c) conviction was upheld.

In other cases, it is clear from the record that the actions of the defendant upon which the now-infirm "use" charge is predicated necessarily constitute a "carrying" of the firearm as that term is used in the statute. In those cases, we have affirmed the section 924(c) convictions because the uncontested actions of a defendant clearly fit the definition of "carry." For instance, in *United States v. Baker*, 78 F.3d 1241 (7th Cir.1996), we considered the appeal of a defendant who had been arrested following a traffic stop. Discovered under the driver's seat was a loaded gun, with its hammer cocked, resting on top of a bag containing crack cocaine. The jury was instructed erroneously with respect to "use" in pre-*Bailey* terms and correctly with respect to "carry"; it returned a general verdict of guilty. Noting that there was no evidence at all that the firearm was ever "used" within the post-*Bailey* meaning of the statute, we nevertheless upheld the defendant's conviction because we concluded that a properly instructed jury would have convicted the defendant. To return its original verdict of guilty, the jury *necessarily* accepted the testimony that the weapon was discovered under the driver's seat following the traffic stop. Because the defendant had transported the weapon and because the weapon was within his reach, we held that the evidence established that the defendant had carried the firearm. Thus,

the conviction against the defendant was upheld, despite the erroneous jury instruction. Judge Kearse, writing for the Second Circuit, reached the same result in *United States v. Pimentel*, 83 F.3d 55, 59 (2d Cir.1996). Although, under post-*Bailey* standards, there was insufficient evidence of "use," the conviction in *Pimentel* was affirmed because the only evidence of "use" clearly satisfied the definition of "carry." *Accord United States v. Riascos–Suarez*, 73 F.3d 616, 623 (6th Cir.) (upholding conviction because, although evidence would not support a determination of "use," the same evidence necessarily supported a determination of "carry"), *cert. denied*, —— U.S. ——, 117 S.Ct. 136, —— L.Ed.2d —— (1996).

On the other hand, when the evidence of record will not sustain a conviction under the new law of "use" and also will not sustain a conviction for "carrying" the weapon, we have vitiated the conviction. *See United States v. Abdul*, 75 F.3d 327, 330 (7th Cir.) (holding that loaded pistol under defendant's bed, even though in same room with the drugs, is not sufficient evidence of "use" of a firearm in relation to the drug offense), *cert. denied*, —— U.S. ——, 116 S.Ct. 2569, 135 L.Ed.2d 1085 (1996); *United States v. Lamb*, 74 F.3d 751, 752 (7th Cir.1996) (holding that firearms found under pillow and under bed, even though near drug stash, were not sufficient evidence that they were actively employed in a drug transaction); *United States v. Monroe*, 73 F.3d 129, 133 (7th Cir.1995) (holding that weapons used to protect drugs and money were not sufficient evidence that they were actively employed or carried during the course of the conspiracy).

Finally, we have set aside the convictions and remanded for a new trial when the evidence, insufficient under the post-*Bailey* "use" prong, would have supported, but not compelled, a conviction under the "carry" prong rather than the "use" prong. In *United States v. Thomas*, 86 F.3d 647 (7th Cir. 1996), we remanded the defendant's section 924(c) charge for a new trial. The evidence introduced at trial against the defendant showed that one conspiracy member clearly had "used" a firearm during a shoot-out with out-of-town crack dealers during a turf war.

It also revealed that a firearm had been "carried" by a conspiracy member when he brought a handgun with him to chase competing drug dealers away from the place where he was selling drugs. Although each of these instances would have supported a conviction under section 924(c), there was also evidence introduced that may have led the jury to convict the defendants under the incorrect understanding of "use"—namely, evidence that some conspiracy members owned handguns and kept them at their homes to protect their drugs and drug proceeds. Because the jury could have relied upon the evidence of mere possession of the firearms, we held that the defendants' convictions could not be upheld and remanded for a new trial on the section 924(c) count. *Id.* at 651.

Our decision in *United States v. Smith,* 80 F.3d 215 (7th Cir.1996) also evidences this approach. Following a traffic stop, two unloaded, disassembled guns were discovered in the trunk of a car. A search of a coconspirator's van, following a separate traffic stop, revealed a handgun on the back bench seat of the van, within reach of a passenger. The jury was instructed contrary to the law established in *Bailey;* thus a conviction could not be sustained on the theory that the firearms had been "used" in the commission of a drug crime. Nevertheless, the evidence of the firearm found in the back seat of the van within reach was sufficient to establish "carrying" of firearms, although it did not compel such a finding. As in *Holmes,* there was evidence of multiple firearms introduced at trial against the defendants, and the jury's verdict did not necessarily rest on the evidence that would sustain a conviction for "carrying" a firearm. We remanded the case for a new trial because, although the evidence could support a "carry" conviction, this determination could not be made by appellate review.

The recent decision of the United States Court of Appeals for the Tenth Circuit in *United States v. Miller,* 84 F.3d 1244, 1258 (10th Cir.1996) also follows, in detailed fashion, the analysis that we have outlined here. In that case, the defendant was charged with using and carrying a firearm. Employing

the analysis that we have outlined, the court first noted that, had the district court correctly instructed the jury with respect to both "use" and "carry," *Griffin* would allow affirmance if the evidence was sufficient under either prong. *Id.* at 1257. However, because the district court had given a pre-*Bailey* "use" instruction, reversal was required "unless we can determine with absolute certainty that the jury based its verdict on the ground on which it was correctly instructed." *Id.* Upon examining the record, the court concluded that the jury's verdict might well have been predicated upon the pre-*Bailey* "use" instructions because there was evidence to support such decision. Therefore, the court determined that it could not allow the use conviction to stand.

The court then determined that, although the defendant had articulated his argument in terms of the sufficiency of the evidence, the gravamen of his submission was that the jury had not been instructed properly. *Id.* at 1258. Relying on its earlier decision in *United States v. Wacker,* 72 F.3d 1453 (10th Cir.1995), *cert. denied,* — U.S. ——, 117 S.Ct. 136, — L.Ed.2d —— (1996), it held that a remand for a new trial was proper if the evidence of record established that a jury properly instructed could have found the defendant guilty of either "use" or "carry." The court then surveyed the evidence and determined that, although the evidence would not support a post-*Bailey* conviction for "use," it could support a conviction for "carry." Therefore, it remanded the case to the district court for trial on the allegation that the defendant had carried the weapon. *Miller,* 84 F.3d at 1261. Although the Tenth Circuit may well have adopted a more liberal interpretation of the word "carry" than our own case law would allow, we nevertheless detect no division between us with respect to methodology.

4.

We now turn to the circumstances of the case before us. We follow the methodology found in our earlier cases and in the Tenth Circuit's decision in *Miller.* The indictment charged Mr. Gonzalez and Mr. Ramirez with using or carrying firearms; thus,

under the indictment the jury could have convicted the defendants if it found them guilty of either use or carriage. However, the jury was instructed only on the "use" of a firearm, and the instruction was erroneous under *Bailey*.

Upon examination of the record, we believe that the decision to instruct the jury solely on the meaning of "use" and not of "carry" was the result of a misapprehension by all participants in the trial that the issue could be put fairly to the jury through the "use" instruction. *Bailey*, issued by the Supreme Court after the trial, made it clear that "use" had a more restrictive meaning and that the action of the defendant is more appropriately characterized, if the government's view of the evidence is accepted by the jury, as "carrying" the weapon. We believe that, under these circumstances, there is no impediment to permitting the retrial of the matter under the definitions that *Bailey* has now approved. The error in the earlier proceedings is, despite the nomenclature employed by the defendant, more akin to trial error than to the legal insufficiency of the evidence. *See Wacker*, 72 F.3d at 1465 (permitting retrial under post-*Bailey* standard of "use" on the ground that the earlier standard did not afford the government sufficient notice of what had to be proved);[11] *cf. Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988) (Double Jeopardy Clause does not bar retrial when government's evidence is ruled inadmissible on appeal and remainder of submission is insufficient to sustain conviction).

### Conclusion

For the reasons presented above, we affirm the convictions of the defendants on Counts I and II, the conspiracy and heroin possession charges. We vacate the conviction as to each defendant on Count III of the indictment, the section 924(c) charge, and remand the case for retrial and, if necessary, resentencing[12] on the issue of using or carrying a firearm in relation to the commission of a drug trafficking offense.

AFFIRMED IN PART and VACATED AND REMANDED IN PART.

**11.** This case of course poses a different situation from the one before the Court of Appeals for the Fifth Circuit in *United States v. Johnson*, 87 F.3d 133 (5th Cir.1996) (per curiam). In that case, a defendant was indicted for carrying and using a firearm but the jury was instructed only on the meaning of the term "use." After *Bailey*, the firearms conviction nevertheless was affirmed because the court held that the underlying conduct also violated the new definition of "use." The defendant, a passenger in a vehicle stopped for erratic driving, had a zipper bag with cocaine base in it between his legs and another zipper case with a loaded pistol protruding from it next to him on the transmission hump of the vehicle. Because the defendant "reached for the gun while being apprehended," *id.* at 138, the Fifth Circuit found that a jury "reasonably could conclude that [the defendant] actively employed the firearm in relation to his underlying drug offense." *Id.*

**12.** *See Vasquez*, 85 F.3d at 61 (remanding for consideration of resentencing on the remaining counts).