**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Corey T. ROBINSON and Michael Scott,
Jr., Defendants–Appellants.**

Nos. 95–3254, 95–3361.

United States Court of Appeals,
Seventh Circuit.

Argued June 7, 1996.

Decided Sept. 13, 1996.

Bruce E. Reppert (argued in No. 95–3254 and submitted in No. 95–3361), Office of United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff-Appellee.

Paul M. Storment, Jr., (argued), Belleville, IL, for Corey T. Robinson.

John J. O'Gara, Jr., Trentman & O'Gara, Belleville, IL, for Michael Scott.

Michael Scott, Littleton, CO, Pro Se.

Before POSNER, Chief Judge, and FLAUM and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

Corey Robinson, Michael Scott, Jr., and Andre Monroe [1] were indicted in a two-count indictment for conspiring to possess with intent to distribute cocaine base (crack cocaine), in violation of 21 U.S.C. §§ 841(a)(1) and 846, and for using or carrying a firearm in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1). Scott pled guilty to both counts and testified against Robinson at trial. Robinson was convicted by a jury of both counts. He appeals his conviction for using or carrying a firearm, the district court's refusal to give a "mere presence" instruction, and the court's calculation of the amount of drugs he was responsible for at sentencing. We reverse and remand Robinson's conviction for using or carrying a firearm, but affirm the court's rejection of the mere presence instruction and calculation of the drugs attributable to him. Scott also appeals, but we dismiss his appeal and grant his counsel's motion to withdraw.

## I. Facts

During the summer of 1993, Michael Scott, Jr., and his brother, Andre Monroe, moved

---

1. Andre Monroe, sometimes referred to as Andre Scott, is Michael Scott's brother; he is not involved in this appeal.

from East St. Louis to Murphysboro, Illinois and set up a crack cocaine distribution business there. The two made periodic trips back to East St. Louis to buy drugs and operated their business out of various homes in Murphysboro. For a while Scott and Monroe lived with Scott's girlfriend and her baby and established a thriving drug trade in the home. One witness described the drug-selling activity at this home saying, "It was like a supermarket. It was—it was a crazy place. It was constantly 24 hours a day. Crack was always being sold out of there."

During the fall of 1993, Monroe left town after being robbed and beaten up in the home. Corey Robinson, who went by the name "E," essentially took Monroe's place in Scott's drug business, and Scott and Robinson began selling together in the Murphysboro area. Scott acknowledged at trial that he had sold crack with Robinson out of the Murphysboro home of a woman named Jeri Branch.[2] Several other witnesses also testified to observing Scott and Robinson selling crack together. Specifically, Timothy Robinson,[3] another local drug dealer and a friend of Michael Scott and Corey Robinson, testified that he once picked up Scott and Robinson in East St. Louis and that each of them brought back one ounce of crack cocaine. Timothy Robinson testified to observing Corey Robinson and Michael Scott regularly selling crack together for a period of five weeks out of Jeri Branch's home. He described their business as going "seven days a week" with "[a] constant flow everyday." Timothy Robinson also stated that he would conservatively estimate that Corey Robinson sold approximately five ounces of crack during this period. Martin Alexander likewise

testified that he observed Corey Robinson and Michael Scott selling together at that location and that he had purchased cocaine from Robinson there, though he couldn't say how many times.[4] Alexander stated that he once picked up Robinson and Scott at a home in East St. Louis and that while driving home he observed a couple of bags of golf-ball size chunks of crack in the back seat of the car. Alexander stated that Timothy Robinson, who also came along for the trip, had one of the bags, but he was not sure if Corey Robinson had the other one or not. Terrell Kempfer testified to buying crack from Corey Robinson two or three times.[5] And Charlene Branch, who was in the federal witness protection program at the time of trial, testified that she observed Corey Robinson and Michael Scott selling crack together from her sister Jeri's home on more than 50 occasions and that she herself purchased crack from them as many as 50 times, though "sometimes" both men were not present.

The government also presented substantial evidence at trial regarding the use and possession of numerous firearms by Corey Robinson and Michael Scott. Scott himself admitted to owning two guns, a Glock 40 and a Ruger 40, for "protection" and testified that he had observed Robinson with guns while selling crack cocaine.[6] Timothy Robinson testified to seeing Scott with a .40 caliber Ruger while Scott was selling crack and also to seeing him in possession of an "AK 47" assault rifle. Timothy Robinson further recounted observing Corey Robinson with a Glock 40 while Corey was dealing drugs. Dee Ann Hudson described seeing assorted guns at the home shared by Michael Scott

---

**2.** After pleading guilty to both counts in the indictment on the morning of trial, Scott testified against Robinson under a compulsion order. Scott was granted immunity for the substance of his testimony.

**3.** It does not appear from the record that Corey Robinson and Timothy Robinson are related. Timothy Robinson was incarcerated at the time of the trial, after pleading guilty to distribution of crack cocaine. He acknowledged at trial that he was testifying as part of his plea agreement and was hoping that his sentence would be reduced due to his cooperation.

**4.** Martin Alexander had previously pled guilty to conspiring to distribute crack cocaine and was incarcerated at the time of trial.

**5.** Kempfer admitted at trial that he was convicted in 1988 for possession of one ounce of marijuana and was then in custody in Illinois on a residential burglary charge.

**6.** The government's firearms expert at trial, Donald Gunnell, identified the two guns recovered in this case, *see infra* note 7, and specifically named in the indictment as a 9 millimeter semi-automatic pistol (also known as a Ruger model "Tec 9") and a .40 caliber semi-automatic Glock pistol.

and his girlfriend, including a .38 revolver that was generally left on the coffee table and what looked like an assault rifle in a closet. Hudson also related an episode where Scott became afraid that the cops were watching his home and gave Hudson a gun to keep for him for a day. Martin Alexander testified that when he picked up Robinson and Scott in East St. Louis, one of them had a 9 millimeter and the other had a Glock, though he was not sure who had which gun. Alexander also stated that both men were always "armed" when they sold drugs. Charlene Branch likewise testified that she had seen Scott and Robinson with guns and that, as far as she knew, they were always "armed" when they were selling crack cocaine together.

Two other witnesses described incidents in which a firearm was used in connection with collection of a debt. Terrell Kempfer testified to an incident in which he saw Robinson walking a man named Demetrius Johnson across a yard with a gun pointed at his chest; Robinson was threatening to shoot Johnson over $40 that was owed. Issac Bratcher, a special agent with the F.B.I., testified that in August of 1994, while questioning Robinson in connection with an armed robbery in Carbondale, Illinois, Robinson admitted that he been in Carbondale with Michael Scott to "make some money" and collect on a debt. According to Bratcher, Robinson admitted during this questioning that he had brought a 9 millimeter assault pistol, while Scott had come with a Glock .40 caliber handgun. Robinson recounted to Bratcher that he and Scott travelled to a housing project area known as "Crack Alley," broke up a dice game that the "debtor" was involved in by displaying their guns, and then took the money left behind when everyone scattered. Robinson also stated that he then fired his gun into the air two or three times before he and Scott left the scene.[7] The government maintains that the Scott/Robinson crack cocaine conspiracy ended with Robinson's arrest for the armed robbery in August 1994.

Robinson was tried on June 12–13, 1995. He was convicted by a jury, in approximately seventeen minutes, of both counts charged in the indictment: conspiracy to possess with intent to distribute cocaine base and using or carrying a firearm in relation to a drug trafficking offense. Robinson was sentenced to 151 months on the conspiracy count, an additional 60 months on the firearms count, and five years of supervised release. In addition, the court ordered him to pay a $3000 fine and a $100 special assessment.

## II. Robinson

### A.  18 U.S.C. § 924(c)(1)

■ We begin with Robinson's appeal of his conviction for using or carrying a firearm in relation to a drug trafficking offense. The statute reads as follows: "Whoever, during and in relation to any crime of violence or drug trafficking crime ..., uses or carries a firearm, shall, in addition to the punishment provided for such a crime of violence or drug trafficking crime, be sentenced to imprisonment for five years...." 18 U.S.C. § 924(c)(1). Robinson challenges the sufficiency of the evidence presented at trial on this charge, in light of the Supreme Court's recent decision in *Bailey v. United States,* — U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). Such *Bailey* appeals are often framed as challenges to the jury instructions given at trial. The instructions given at trial included the following statement:

> The term "uses or carries a firearm" means having a firearm, or firearms, available to assist or aid in the commission of the crime alleged in Count 1 of the indictment [the conspiracy count].
>
> A firearm is used or carried during and in relation to a drug-trafficking crime if the circumstances of the case show that the firearm facilitated or had a role in the crime by providing a person with the security and confidence to undertake a transaction or series of transactions involving illegal drugs. "Using" a firearm includes the

---

**7.** According to Robinson's statement to Bratcher, when the police attempted to pull over Scott and Robinson (in connection with the robbery), they ditched their car in a trailer park in Murphysboro and fled on foot. After apprehending Robinson, the police recovered the .40 caliber Glock from the car that Robinson and Scott had been travelling in, and Robinson himself led Bratcher to the place where he had stashed the assault weapon, a 9 millimeter Ruger model Tech 9.

possession of a firearm which in any manner facilitates the crime.

. . . .

The government is not required to show that the defendant actually displayed or fired the weapon. The government is required, however, to prove beyond a reasonable doubt that the firearm was in the defendant's possession or under the defendant's control at the time that a crime of violence or drug-trafficking crime was committed.[8]

Prior to *Bailey* this circuit had defined the word "use" in § 924(c) quite broadly,[9] and we have little doubt that this instruction and the conviction that followed would have passed muster under our old law. *Bailey*, however, has changed our frame of reference.

The Supreme Court held in *Bailey* that a conviction for "use" of a firearm under § 924(c)(1) "requires evidence to show an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." —— U.S. at ——, 116 S.Ct. at 505 (emphasis in original). The Court noted that "'use' must connote more than mere possession of a firearm by a person who commits a drug offense." *Id.* at ——, 116 S.Ct. at 506. Thus while the placement of firearms near drugs or drug proceeds and the "emboldening" effect an individual may gain from having a firearm at the ready do not constitute "use," *id.* at —— – ——, 116 S.Ct. at 507–08, "[t]he active-employment understanding of 'use' certainly includes brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." *Id.* at ——, 116 S.Ct. at 508. The instructions set forth above are clearly improper under the dictates of *Bailey*.

■ While Robinson casts his § 924(c)(1) appeal as a sufficiency of the evidence claim, in *United States v. Gonzalez*, 93 F.3d 311 (7th Cir. 1996), we have recently noted that

our analysis of such sufficiency challenges under *Bailey* "must also be informed . . . by the rules that govern our assessment of erroneous jury instructions." *Id.* at 320. We cited *United States v. Holmes*, 93 F.3d 289 (7th Cir. 1996), a case in which the *Bailey* appeal was cast as a jury instruction challenge, and found that "the principles set forth in that opinion are just as relevant when the litigant chooses to cast his submission to the court in terms of sufficiency of the evidence rather than instructional error." *Gonzalez*, 93 F.3d at 320; cf. *United States v. Miller*, 84 F.3d 1244, 1256–61 (10th Cir.1996). In cases such as this one, where the jury instruction on "use" was clearly flawed, whether a § 924(c)(1) conviction will be affirmed outright, reversed outright, or reversed and remanded depends upon the nature of the evidence presented at trial. The essential framework is as follows: 1) if all the firearms evidence presented qualifies as either active-employment "use" or "carry," we will affirm the conviction despite the bad instruction, *see, e.g., United States v. Baker*, 78 F.3d 1241, 1245–47 (7th Cir.1996); 2) if none of the evidence presented qualifies as either active-employment "use" or "carry," we will reverse the conviction outright, *see, e.g., United States v. Monroe*, 73 F.3d 129, 132–33 (7th Cir.1995); and 3) if some of the evidence presented could qualify as either active-employment "use" or as "carry," but other firearms evidence presented exemplifies only possession or some other type of now-defunct, inactive "use," we will reverse the conviction and remand for a new trial, since we cannot be sure whether the jury convicted on the proper basis or the improper basis, *see, e.g., United States v. Thomas*, 86 F.3d 647, 650–51 (7th Cir.1996). *See generally Gonzalez*, 93 F.3d at 320–22; *Holmes*, 93 F.3d at 294–95.

■ The government presented a wealth of evidence at trial that Robinson, along with

---

**8.** A separate instruction informed the jury that if the defendant's co-conspirator (i.e., Scott) used or carried a firearm in furtherance of their drug conspiracy and as a natural consequence of that conspiracy, the defendant could be convicted of the firearms count on that basis.

**9.** See, e.g., *United States v. Woods*, 995 F.2d 713, 718 (7th Cir.1993) ("Dealers who keep drugs 'in strategic proximity' to their drugs or transactions 'use them in relation to' their drug trafficking for purposes of [18 U.S.C. § 924(c)]." ) (citing *United States v. Malin*, 908 F.2d 163, 168 (7th Cir.), cert. denied, 498 U.S. 991, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990)).

his co-conspirator Scott, actively used and carried firearms during and in relation to their drug trafficking conspiracy. Unfortunately, from the government's current perspective, it also put on a substantial amount of firearms evidence that merely established that Robinson and Scott possessed guns at various times and that they were known to carry them outside the context of actual drug dealing. For example, Scott testified to owning guns for protection; Dee Ann Hudson described seeing assorted guns in the home Scott shared with his girlfriend; and both men were seen with guns on occasions that were not clearly drug related. The presentation of this evidence, when combined with the instruction allowing for conviction if the firearms were merely "available to assist or aid in the commission of the crime alleged" or if they gave the conspirators "the security and confidence to undertake a transaction or series of transactions involving illegal drugs," leave open the possibility that the jury's guilty verdict rested on a basis now soundly rejected by the Supreme Court. We cannot be sure that the jury did not base its verdict completely on "mere possession" evidence, even though it certainly could have accepted and relied on the active use or carry evidence. Thus we must reverse and remand Robinson's conviction under § 924(c). While the reversal of such convictions may well result in a windfall for defendants like Robinson, it is the established price of what our justice system is willing to pay for a greater measure of certainty that a defendant was not unlawfully convicted. In this situation, the government maintains the right to repursue the conviction before a properly instructed jury.

### B. Mere Presence Instruction

Robinson also appeals the district court's refusal to give a "mere presence" jury instruction—an instruction informing the jury that "presence at the scene of the crime and knowledge that a crime is being committed are not sufficient to establish the defendant's guilt." The government objected to the proposed instruction, stating that there was no evidence presented at trial that would indicate that Robinson was merely present at the scene of drug transactions. After hearing argument from defense counsel, the court ruled as follows:

> The Court's heard the evidence and does not believe there's been any evidence at all, basically, that would warrant the giving of this proposed instruction. And the Court agrees with the government's position that there's been no position asserted, either through cross examination or through the defense case, that would warrant the giving of this instruction. And I think it would be error for the Court to give it. So the Court is going to deny and refuse Defendant's Instruction No. 1.

Robinson's counsel did not object to the court's refusal to give this instruction.

■ A defendant is indeed entitled to have the jury instructed on his theory of defense, so long as he can demonstrate that his theory is supported by evidence presented at trial, is not covered by other instructions, and does not misstate the law. *United States v. Baker*, 40 F.3d 154, 162 (7th Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1383, 131 L.Ed.2d 237 (1995); *see also United States v. Douglas*, 818 F.2d 1317, 1320–21 (7th Cir.1987). A defendant must, however, object to a court's refusal to give a tendered instruction in order to preserve the issue for appeal. FED. R. CRIM. P. 30; *Baker*, 40 F.3d at 162. Because Robinson did not object to the court's refusal to give the mere presence instruction, we will review the refusal only for plain error. *Id.*

■ Upon reviewing the record in this case, we agree with the district court that the mere presence theory was never presented to the jury during the course of the trial, either through the submission of specific evidence or testimony, or through cross examination and the arguments of defense counsel. In fact, defense counsel stated in closing arguments, "I'm telling you, ladies and gentlemen, that this is not a conspiracy. This is perhaps a possession, perhaps a distribution of guns or drugs. And whether it involves my client is questionable, but this is not a conspiracy." Such a statement hardly reflects a mere presence theory. Defense counsel's focus throughout the trial was on deriding the credibility and character of the

government's witnesses and denying that Robinson was involved in their "conspiracy." He did not argue, however, that Robinson was an innocent who just happened to be hanging around while all sorts of drug dealings went on around him. And Robinson did not put on evidence that would support such a theory.

Furthermore, other instructions that were given adequately informed the jury that Robinson could not be convicted if he was merely present at the scene of criminal activity. For example, the jury was instructed that in order to convict on the conspiracy count, it had to find "[t]hat the defendant knowingly and intentionally became a member of the conspiracy." The court also instructed the jury that

> [t]o be a member of the conspiracy, the defendant need not join at the beginning or know all the other members or the means by which the purpose was to be accomplished. The government must prove beyond a reasonable doubt, from the defendant's own acts and statements, that he was aware of the common purpose and was a willing participant.

These and similar instructions made it clear to the jury that Robinson could only be convicted if he consciously and willfully *joined* the conspiracy. Thus the jury was informed that it could not base its conspiracy conviction on Robinson's "mere presence" at the scene of drug transactions. As we did in *United States v. Tringali,* 71 F.3d 1375, 1380 (7th Cir.1995), we conclude that it was not plain error for the court to refuse to give the proposed instruction.

### C. Calculation of Quantity of Drugs

■ Robinson also challenges the district court's calculation of the quantity of cocaine base involved in the conspiracy. Robinson was indicted under 21 U.S.C. §§ 841(a) and 846 for conspiring to possess with intent to distribute cocaine base, i.e., crack cocaine. Thus his base offense level at sentencing was determined according to the Drug Quantity Table in § 2D1.1 of the Sentencing Guidelines. The district court found that Robinson's drug trafficking activities involved between 150 and 500 grams of cocaine base,[10] giving him a base offense level of 34 on his conspiracy conviction. U.S.S.G. § 2D1.1(c)(3). The sentencing court determines the quantities of drugs involved in an offense by a preponderance of evidence; and we review such findings only for clear error. *United States v. Berchiolly,* 67 F.3d 634, 639 (7th Cir.1995). Hence we will reverse the court's calculation of the amount of drugs involved in an offense only if we are left with a "firm and definite conviction that a mistake has been made." *Id.* (quoting *United States v. Corral–Ibarra,* 25 F.3d 430, 437 (7th Cir. 1994)).

■ By the time of the sentencing hearing, the district court had before it all the trial testimony, a presentence investigation report prepared by a probation officer, and a chart and report prepared by F.B.I. Special Agent Gregory Holston. Holston conducted interviews with seven persons and summarized these interviews in chart form, outlining the quantity of drugs that each witness attributed to Corey Robinson, Michael Scott, and Andre Monroe, respectively, based on his or her interactions with and observations of the men.[11] The government submitted both Holston's chart and his comprehensive summaries of the interviews to the district court at sentencing. At the sentencing hearing, Robinson's counsel acknowledged that Holston's report was "a culmination of previous information ... provided in discovery and does track the information listed in the presentence report."

■ Holston's chart included the following information in regard to Corey Robinson: 1) 50 buys by Charlene Branch, usually of three $20 rocks, which was estimated to be equivalent to 15 grams of crack; 2) Timothy Robinson's estimate that Corey Robinson

---

**10.** One ounce is equivalent to 28.35 grams, thus 150–500 grams equals approximately 5.29–17.64 ounces.

**11.** A sentencing court can make its drug quantity calculation based on such hearsay evidence, as long as the evidence is "reliable" and the defendant is given a reasonable opportunity to rebut it. *See United States v. Francis,* 39 F.3d 803, 809–10 (7th Cir.1994).

sold approximately 5 ounces (over 140 grams) of crack during the period Robinson was seen working with Michael Scott[12]; 3) 4 buys of $20 rocks by Mark Sherrill; 4) 7 buys of $20 rocks and one buy of 1/16 ounce by Lyle M. Bulliner; 5) Martin Alexander's observation of three golf-ball size crack rocks in Robinson's possession[13]; and 6) Carl Blackmon's observations of Robinson selling one-half to one ounce quantities of crack, which was (conservatively) estimated to amount to one-half to one ounce of crack (about 14–28 grams). As noted earlier, Charlene Branch, Timothy Robinson, and Martin Alexander were witnesses at trial, giving the district court the opportunity to observe their testimony and evaluate their credibility. In addition, Gregory Holston attended the sentencing hearing and was available for questioning, but defense counsel declined to cross examine him about the contents of his interview memoranda and summary chart.

■ Robinson's fundamental argument, both at the sentencing hearing and here on appeal, has been that the people providing the drug quantity information are patently unbelievable and that these individuals did not provide adequate information regarding the dates, times, and places where the alleged transactions occurred. After hearing the arguments of counsel at sentencing, the court noted that the quick verdict, which it described as "one of the quickest verdicts this Court's presided over, guilty or not guilty," indicated that the jury must have found the witnesses credible. The court continued, "And this Court, hearing their testimony, too, believed them to be credible witnesses." Regarding Robinson's criticism of the lack of specific details regarding dates of sales, drug amounts, etc., the court noted that it was not in the nature of this "illegal business" to keep records. The court also spoke of being impressed by the certainty with which the witnesses testified about the amounts of drugs involved. As we have reg-

ularly recognized, such credibility judgments are best left "to the sound discretion of the district court, which has the advantage of having observed the demeanor of the witnesses as they testified." United States v. Campbell, 985 F.2d 341, 347 (7th Cir.1993).

The district court was certainly entitled to conclude, based on the evidence presented at trial and brought before it at sentencing, that Robinson's involvement in the drug conspiracy made him responsible for at least 150 grams of cocaine base. The statements of Timothy Robinson and Charlene Branch alone, both of whom the court observed at trial, could place Corey Robinson in the 150–500 gram range. The court's calculation of the amount of crack cocaine attributable to Corey Robinson was not clearly erroneous.

### III. Scott

Michael Scott pled guilty to both conspiring to possess with intent to distribute cocaine base, 21 U.S.C. §§ 841(a)(1) and 846, and using or carrying a firearm in relation to a drug trafficking offense, 18 U.S.C. § 924(c)(1). The district court sentenced Scott to 121 months on the conspiracy count and an additional 60 months on the firearms count, with five years of supervised release; the court also ordered him to pay a $1500 fine and a special assessment of $100. His counsel filed a timely notice of appeal.

On appeal, however, his counsel has filed an Anders brief, stating that there are no non-frivolous issues for appeal, and a motion to withdraw. Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). Pursuant to Circuit Rule 51(a), Scott was informed of his counsel's actions and his right to respond. Scott has filed no response to either the motion to withdraw or the Anders brief.

■ At his sentencing, Scott did not dispute the amount of cocaine base attributed to him by the pre-sentence report (150–500 grams, for a base offense level of 34).

12. Timothy Robinson provided a detailed account of his observations of and dealings with the conspiracy members, including the amounts of crack that were typically sold, during his interview with Holston. A summary of this information was included in Holston's report.

13. Alexander provided extensive information to Holston regarding the operations of the conspiracy, which was summarized in Holston's report.

U.S.S.G. § 2D1.1(c)(3). Scott challenged only the constitutionality of the Sentencing Guideline's drug quantity tables for cocaine base, relative to the treatment of other drugs. As his counsel acknowledges on appeal, we have previously rejected this argument, *see, e.g., United States v. Lawrence,* 951 F.2d 751, 754–55 (7th Cir.1991); *United States v. Scott,* 19 F.3d 1238, 1246 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 163, 130 L.Ed.2d 101 (1994). We see no reason to revisit the question here and agree with Scott's counsel that any appeal on this issue would be "groundless in light of legal principles and decisions." *United States v. Eggen,* 984 F.2d 848, 850 (7th Cir.1993). On the other hand, we are not convinced of counsel's submission that Scott's guilty plea as to his 924(c) conviction was unquestionably taken in compliance with Rule 11. The government's proffer of proof on this count consisted only of the fact that "in connection with the conspiracy alleged in the indictment" Scott "possessed numerous firearms." In light of the holding in *Bailey,* this may well be an insufficient factual basis and additionally not an accurate statement of what the government must prove in order to obtain a 924(c) conviction. Therefore we are unable to conclude that it would be frivolous to argue that Scott's 924(c) plea was not entered into knowingly. Accordingly, we grant present counsel's motion to withdraw, but direct that new appellate counsel be appointed to address the validity of Scott's 924(c) plea.

### IV.

For the foregoing reasons, we reverse and remand Corey Robinson's conviction under 18 U.S.C. § 924(c)(1), but affirm his conviction under 21 U.S.C. §§ 841(a)(1) and 846, as well as the district court's calculation of the quantity of cocaine base involved in the offense. In addition, we dismiss Michael Scott's appeal as to the constitutionality of the guideline drug quantity tables and appoint new counsel for his 924(c) plea challenge.