**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Stephen GOLDEN, Defendant–Appellant.**

No. 96–1380.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1996.

Decided Dec. 18, 1996.

Andrew B. Baker, Jr. (argued), Office of the United States Attorney, Dyer, IN, for Plaintiff–Appellee.

Jerry L. Peteet (argued), Gary, IN, for Defendant–Appellant.

Before BAUER, FLAUM and DIANE P. WOOD, Circuit Judges.

BAUER, Circuit Judge.

A jury convicted Stephen Golden on December 8, 1994 on nine drug-related counts, including conspiracy to possess with intent to distribute cocaine base ("crack") in violation

of 21 U.S.C. § 846, distribution of crack in violation of 21 U.S.C. § 841(a)(1), use of a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c), and employment of juveniles for drug distribution in violation of 21 U.S.C. § 861(a)(1). On appeal, Golden argues that the district court should have granted his mid-trial request for new counsel, that there was insufficient evidence for the district court to determine that the conspiracy distributed 2.5 kilograms of crack, and that he was not "properly charged" with using a firearm in relation to a drug trafficking crime. We find that in light of *Bailey v. United States,* — U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), we must reverse the § 924(c) firearm conviction. We affirm Golden's convictions and sentences on all other counts.

## BACKGROUND

From approximately November 1993 until August 3, 1994, Golden was the head of an operation which distributed crack in Hammond, Indiana and Calumet City, Illinois. Initially, Golden himself distributed the crack from his apartment at 5495 Hyslop Street in Hammond, where he lived with his wife, Seniqueca, in October and November 1993. He then employed other tenants, twenty-four-year-old Joseph Rodriguez ("Rodriguez") and Rodriguez's girlfriend, seventeen-year-old Reva Nieto ("Reva"), to assist in distribution at the Hyslop Street building. In November 1993, Golden and Seniqueca moved to a house at 6039 Jackson Street in Hammond. Some distribution occurred at the Jackson Street house, but it mainly continued at the Hyslop Street building. Golden expanded the business. Among his new employees were Reva's sixteen-year-old brother, Walter Nieto ("Nieto"), sixteen-year-old Jimmy Flynn ("Flynn"), and fifteen-year-old Carlos Alfaro ("Alfaro").

Golden travelled to Chicago, Illinois, where he bought crack in golf-ball-sized chunks. He brought the chunks back to Hammond, broke them into small pieces of approximately 0.1 gram or more each, and packaged the pieces in plastic bags which he or his workers sold for $10 apiece ("dime bags"). His workers received large packages containing many dime bags and, in return, delivered money to Golden either at the Hyslop Street building or at the Jackson Street house. Evidence adduced at trial showed that during its existence, the conspiracy distributed between 10 and 30 grams of crack daily.

In December 1993, Rodriguez bought two Lorcin .380 semi-automatic pistols from East Chicago, Indiana for Golden. Rodriguez, Seniqueca and Nieto picked up the guns while Golden waited in a second car. On January 20, 1994, an informant and an undercover Hammond police officer bought a total of three bags of crack from Flynn at the Hyslop Street building. In early February 1994, Golden moved the crack operation from the Hyslop Street building to the Jackson Street house, where police and agents from the Bureau of Alcohol, Tobacco and Firearms ("ATF") conducted surveillance. On February 1, 1994, Hammond police officers picked up the trash behind the Jackson Street house. The police found a record Seniqueca kept for Golden which tracked an average day's drug sales by the various workers. The record indicated who had purchased drugs, how much they had paid, and the time of day of the purchases. The police also recovered an empty box for a Lorcin .380, an empty box for .380 ammunition, and two letters from Seniqueca to Golden which referred to the crack operation.

On February 5, 1994, Rodriguez gave the Hammond police a statement about Golden's crack business. The police subsequently obtained a warrant to search the Jackson Street house. Hammond police officers and ATF Special Agents executed the warrant on the evening of February 11, 1994. The officers arrested Alfaro, who was carrying two dime bags, $1,310, and a Lorcin .380 (with serial numbers matching the box found in the trash on February 1). In the house, the officers found boxes of .380 ammunition, a box for a Lorcin .380 (with different serial numbers than the gun Alfaro was carrying), a package with 31 dime bags containing 4.32 grams of crack, pagers, and plastic baggies.

Following the February 11 raid, Golden moved the operation to Calumet City, Illinois for several weeks, but eventually moved it back to the Jackson Street house in March or

April of 1994. On July 29, 1994, one of Golden's regular customers, Debra Darge, was arrested after buying crack at the Jackson Street house. Darge agreed to cooperate with the police. On August 1, 1994, Darge made a controlled purchase of four dime bags from Golden. After that purchase and after further surveillance of the Jackson Street house, a second search warrant was executed on August 3, 1994. The police recovered $900 and one dime bag, and Golden and Seniqueca were both arrested.

Robert Lewis was appointed to represent Golden. On August 18, 1994, a federal grand jury returned a twelve-count indictment against Golden and Seniqueca charging them with participating in a conspiracy to distribute cocaine base and with committing various other drug-related offenses.[1] On September 14, 1994, Lewis was allowed to withdraw because he represented a potential government witness. R. Cordell Funk was appointed to replace Lewis. Golden's trial began on December 5, 1994. On the second day of trial, Golden complained to the district court about Funk and requested new counsel or, alternatively, asked for a thirty-day continuance in order to obtain new or "better" counsel. The district court denied this motion. On December 8, 1994, Golden was found guilty of Counts 1 and 4–11 in separate verdicts.[2] Twenty days after Golden was found guilty, he filed a *pro se* motion for a new trial, alleging ineffective assistance of counsel by Funk. Funk filed a motion to withdraw on January 6, 1995, and the court granted the motion on January 31, 1995. For the third time, the district court appointed new counsel, Jerry L. Peteet. On April 19, 1995, Peteet filed a second motion for a new trial on Golden's behalf, reiterating Golden's claims of ineffective assistance by Funk and alleging unspecified newly-discovered evidence. On May 1, 1995, the district court

denied the motion. On February 5, 1996, Golden, represented by Peteet, was sentenced to life imprisonment and a ten-year term of supervised release. The court also imposed a sixty-month consecutive term on the firearm charge.

Golden has had various conflicts with Peteet. Peteet filed a motion to withdraw as appellate counsel and we denied that motion. Peteet, therefore, represents Golden on appeal, where Golden asks us to vacate the verdicts and to remand for a new trial.

## ANALYSIS

### A. Ineffective Assistance of Trial Counsel

■ In several muddled and sparsely-supported arguments, Golden contends that he received ineffective assistance by Funk at trial. In his brief, Golden states that the "most important[ ]" argument he makes concerning his trial counsel is that he should have been afforded a mid-trial substitution of counsel because of the "irreconcilable differences" between him and Funk.

■ If the defendant has been given an opportunity to explain to the court the reasons behind a request for new counsel, we will review the denial of that request only for abuse of discretion. *United States v. Goad*, 44 F.3d 580, 589 (7th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 93, 133 L.Ed.2d 49 (1995) (citations omitted). Here, the district court properly cleared the courtroom immediately after learning of Golden's concerns about Funk and held an *in camera* hearing to identify the source of Golden's problems. The record indicates, and we are convinced, that the district court gave Golden more than an adequate opportunity to explain the reasons behind his request for new counsel, so we review the district court's denial of Gold-

---

1. Seniqueca pleaded guilty to one count of travelling in interstate commerce in aid of racketeering and was sentenced to probation. She testified against Golden at his trial.

2. Golden was found guilty of the following counts: Count 1, conspiring to possess with intent to distribute cocaine base in violation of 21 U.S.C. § 846; Counts 4, 5, 7 and 8, distributing crack in violation of 21 U.S.C. § 841(a)(1); Count 6, using a firearm in relation to a drug

trafficking crime in violation of 18 U.S.C. § 924(c); and Counts 9, 10 and 11, employing juveniles for drug distribution in violation of 21 U.S.C. § 861(a)(1).

Prior to trial, the Government dismissed Counts 2 and 3, maintaining crack houses in violation of 21 U.S.C. § 856(a)(1), and Count 12, travelling in interstate commerce in aid of racketeering in violation of 18 U.S.C. § 1952.

en's request for substitute counsel for abuse of discretion.

■ In determining whether the district court abused its discretion in denying a motion for substitute counsel, we consider several factors including: (1) the timeliness of the motion; (2) the adequacy of the court's inquiry into the defendant's motion; and (3) whether the conflict was so great that it resulted in a total lack of communication preventing an adequate defense. *United States v. Zillges,* 978 F.2d 369, 372 (7th Cir. 1992) (citations omitted). Although the *Zillges* factors are not exhaustive (*United States v. Brown,* 79 F.3d 1499, 1506 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 196, 136 L.Ed.2d 133 (1996)), we consider them first.

■ We find that Golden's request for new counsel on the second day of trial was untimely. Golden argues that he informed the court before trial, during trial, and during the plea negotiations that he had a conflict with Funk. However, the record indicates that the first time Golden informed the district court that he was dissatisfied with Funk was the second day of trial.[3] We have previously found that motions for new counsel made prior to trial were timely. *See, e.g., Brown,* 79 F.3d at 1506 (finding motion made two months prior to trial timely); *Zillges,* 978 F.2d at 372 (finding motion made approximately one month prior to trial timely). However, we have rarely found that a request for new counsel made during trial was timely. *See United States v. Wilks,* 46 F.3d 640, 643 (7th Cir.1995) (finding timing of request for new counsel made during opening statement "questionable to say the least"); *United States v. Hall,* 35 F.3d 310, 313–14 (7th Cir.1994) (finding request made after plea and ten days prior to sentencing untimely); *c.f. United States v. Tolliver,* 937 F.2d 1183, 1187–88 (7th Cir.), *cert. denied,* 502 U.S. 919, 112 S.Ct. 329, 116 L.Ed.2d 269 (1991) (finding mid-trial request for continuance so *pro se* defendant could obtain counsel

untimely). Accordingly, we find that Golden's request on the second day of trial was untimely and merely a "tactic to manipulate or delay the trial." *Brown,* 79 F.3d at 1506.

■ Second, we find that the district court's investigation into the problems between Golden and Funk was more than adequate. "Unless the complaint underlying the request for new counsel is sufficiently detailed, the court may not rule on the motion without conducting a proper hearing at which both attorney and client testify as to the nature of their conflict." *Hall,* 35 F.3d at 313 (citations omitted). As mentioned above, after emptying the courtroom, the district court conducted a thorough hearing in which it allowed both Golden and Funk to air their respective concerns about their relationship. The district court expressly tried to elicit the essence of Golden's complaints. The court pointedly asked, "Mr. Golden, is your complaint regarding what Mr. Funk did to you prior to this trial or is your complaint what occurred today?" The district court allowed Golden a chance to explain the nature of his difficulties in communicating with Funk and allowed Funk time to respond. The court found that it was difficult to identify the source of the problems between them, but that the problems seemed to be coming from disagreement over strategy or from the "bed side manner ... of the attorney toward the client." The district court specifically noted that it weighed several factors in its decision, including "the defendant's right to a continuance," "the Court's and the public's interest in an efficient adjudication in managing its court calendar," "the detriment to the Government," and "the defendant's lack of funds." The district court explained to Golden that he could appear *pro se,* but the court also explained the dangers in doing so. Moreover, at the end of the hearing, the district court indicated that if Golden had any other complaints, he should bring them to the court's attention. Considering both the length of the investigation and the manner in which it was conducted, we are con-

---

**3.** At the hearing, Golden told the district court that he had sent a letter to the court complaining about Funk before the trial. The district court was unable to locate this letter, but offered to allow Golden to retrieve it from the Correctional Center or submit a receipt for such a letter. Golden did not do so, and this letter is not a part of the record on appeal. We therefore do not consider it in determining whether Golden's motion was timely.

vinced that the district court adequately inquired into the defendant's request for new counsel.

■ Finally, we agree with the district court's conclusion that there was not so great a conflict between Funk and Golden that "it resulted in a total lack of communication preventing an adequate defense." *Zillges,* 978 F.2d at 372. Our careful review of the record indicates that there was indeed a personality conflict between Golden and Funk, but it also indicates that some communication was taking place between them. After Golden was indicted, Funk wrote two letters to Golden which advised him on what the possible sentences would be if Golden were convicted at a trial and what they would be if he accepted a guilty plea. Further, the record indicates that following his examination of each witness, Funk would ask Golden whether Golden had any other questions or areas into which he wished Funk to inquire. During an examination made by the district court prior to the start of his case, Golden unambiguously stated that he was making a knowing and voluntary decision not to testify, and that he was aware that it was his and not Funk's decision. Most significantly, during the substitution-of-counsel hearing, Golden explicitly told the district court that he was not dissatisfied with Funk's performance at trial. Under these facts, there was not a total breakdown in communication between Funk and Golden which prevented Golden from presenting an adequate defense.

■ As noted above, most of Golden's complaints were about Funk's "bedside manner" and were complaints of a personal nature. It is well-established that the Sixth Amendment does not require an attorney and a client to have a meaningful attorney-client relationship or good rapport. *United States v. Turk,* 870 F.2d 1304, 1307–08 (7th Cir.1989) (citations omitted). "The sixth amendment requires the court to satisfy itself that the defendant is adequately represented, not to speculate on the complex emotional relationship of a client and her lawyer." *Id.* at 1308. We also have indicated that we will not find a denial of a request for new counsel to be an abuse of discretion when the request is based on a personality conflict or a disagreement over trial strategy. *United States v. Hillsberg,* 812 F.2d 328, 333–34 (7th Cir.), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987) (citation omitted). In sum, we find that application of the *Zillges* factors to this case, along with our other considerations, confirm that the district court did not abuse its discretion in refusing to allow Golden a midtrial substitution of counsel.

■ Golden also appears to make a more generalized Sixth Amendment argument that his right to effective assistance of counsel at trial was violated by this "complete breakdown of communication" between him and Funk. Golden argues that the lack of communication between them prevented Golden from accepting a guilty plea and intimidated him into not testifying at trial. Golden bears a heavy burden in establishing this claim. *Bond v. United States,* 77 F.3d 1009, 1012 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 270, 136 L.Ed.2d 194 (1996). We presume Funk rendered adequate assistance and exercised reasonable professional judgment in making all significant decisions. *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984); *United States v. Moutry,* 46 F.3d 598, 604 (7th Cir.1995). To overcome this presumption, Golden must show both that Funk's "representation fell below an objective standard of reasonableness" and that "but for" Funk's deficiencies, "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 687–88, 694, 104 S.Ct. at 2064–65, 2068; *Moutry,* 46 F.3d at 605.

■ As the district court stated during the substitution-of-counsel hearing, Funk appeared vigorous in his defense of Golden in that he made appropriate objections and cross-examined witnesses. Funk also filed appropriate pretrial motions in limine and motions to suppress and was successful in having evidence excluded prior to trial. We find the following interchange during the substitution-of-counsel hearing to be particularly significant:

THE COURT: Well, Mr. Golden, is there something that he [Funk] has done during this trial that you feel is ineffective? Do

you feel his examination of witnesses was ineffective, that his opening statement was ineffective?

GOLDEN: Pardon?

THE COURT: That his opening statement was ineffective?

GOLDEN: No, no, sir, no, sir, Your Honor.

THE COURT: Are you—do you feel comfortable that he did an effective job on opening statement?

GOLDEN: Yesterday, yes, sir, Your Honor.

THE COURT: That he did an effective job on cross examination of your wife?

GOLDEN: Yes, sir, Your Honor.

\* \* \* \* \* \*

THE COURT: Mr. Golden, maybe I can short cut it; do you feel he's not—does not know what he's doing? Do you feel that he's incompetent?

GOLDEN: No, sir.

In sum, we find that Golden received more than "reasonably effective assistance" of counsel at trial.

■ We glean from his brief that Golden is identifying two specific acts or omissions by Funk that he believes are objectively unreasonable. First, Golden suggests that if he had been properly advised by Funk prior to trial, he "would have had the opportunity to accept the plea upon proper explanation and discussion." It is well-settled that the *Strickland* test applies to the plea process. *Hill v. Lockhart,* 474 U.S. 52, 57, 106 S.Ct. 366, 369–70, 88 L.Ed.2d 203 (1985). In *Johnson v. Duckworth,* 793 F.2d 898 (7th Cir.), *cert. denied,* 479 U.S. 937, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986), we discussed the ineffective assistance implications of a defendant's decision to reject a plea. We concluded that:

[I]n the ordinary case criminal defense attorneys have a duty to inform their clients of plea agreements proffered by the prosecution, and that failure to do so constitutes ineffective assistance of counsel under the sixth and fourteenth amendments. Apart from merely being informed about the proffered agreement, we also believe that a defendant must be involved in the decision-making process regarding the agreement's ultimate acceptance or rejection.

*Id.* at 902. Our review of the record indicates that Golden received effective assistance of counsel regarding whether he should accept the plea. Funk wrote two letters to Golden explaining the charges against him and the likely prison time he would face if convicted of these charges. Similarly, Funk advised Golden as to the likely prison time he would face if he accepted a guilty plea. As was Golden's prerogative, he chose to plead not guilty, maintain his profession of innocence, and proceed to trial. Golden was indeed found guilty and sentenced to life imprisonment as predicted by Funk. Thus, we conclude that Funk's pre-trial performance regarding the plea agreement was within the range of competence we demand from criminal attorneys.

■ Golden's brief also suggests that the conflict between him and Funk resulted in Golden's "not testifying due to intimidation." We find nothing in the record to suggest that Funk was incompetent or intimidating when advising Golden as to whether he should testify. Funk and Golden apparently disagreed as to whether Golden should testify, but the district court explicitly told Golden at the substitution-of-counsel hearing that the decision to testify was completely his own. The district court suggested that an interrogation be made on the record prior to Golden's decision. Such an inquiry was indeed made, and Golden's testimony indicates that he voluntarily and willingly decided not to take the stand. Although Golden testified that he felt intimidated by Funk, he also stated that he did not wish to take the stand, whether or not he felt intimidated. Golden was unequivocally advised, and appeared to understand, that he alone held the ultimate say-so in whether he would testify. Here again, we fail to see incompetence in Funk's performance or anything in Funk's performance that intimidated Golden into not testifying. To conclude, we find that Funk's trial performance was well "within the range of competence demanded of attorneys in criminal cases." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. We therefore need not ad-

dress the prejudice prong of the *Strickland* analysis.

### B. *Sufficiency of the Evidence Regarding the Quantity of Drugs*

At sentencing, the district court adopted the position from the presentence report that Golden's operation resulted in the distribution of between 10 and 30 grams of crack per day from November 1993 through August 3, 1994. The district court therefore concluded that Golden was responsible for the distribution of 2.5 kilograms of crack, giving him a base offense level under the Sentencing Guidelines of 38. See United States Sentencing Guidelines § 2D1.1. Golden argues that the evidence presented at trial was insufficient for the district court to find the conspiracy responsible for this amount of crack. He contends that the evidence presented regarding the quantity of drugs came from several uncharged witnesses who gave varying and conflicting testimony as to the amount of the drugs they received and sold. Golden believes that these parties had motives to lie and were biased by the lenient treatment they received from the Government.

 The district court must determine the quantity of drugs attributable to a defendant by a preponderance of evidence, and we review the district court's findings only for clear error. *United States v. Robinson*, 96 F.3d 246, 252 (7th Cir.1996). The district court may estimate the quantity of drugs involved. *United States v. Sturman*, 49 F.3d 1275, 1284 (7th Cir.1995). We will reverse the district court's calculation of the quantity of drugs only if we have a "firm and definite conviction that a mistake has been made." *United States v. Corral–Ibarra*, 25 F.3d 430, 437 (7th Cir.1994).

We have no such conviction here. The evidence at trial showed that the crack was distributed in dime bags, each of which contained approximately 0.1 gram or more of crack. That is, the sale of 10 dime bags was the equivalent of the sale of 1 gram of crack. Seniqueca testified that approximately 50 to 100 bags (5 to 10 grams) were sold at the Hyslop Street building per day, whereas Rodriguez testified that they were selling

$3,000 (approximately 30 grams) worth of crack at the building per day. Rodriguez also testified that 50 to 200 bags (5 to 20 grams) were sold per day from the Hyslop Street building on weekdays and 300 to 500 bags (30 to 50 grams) were sold per day on the weekends. Nieto testified that on an average weekday, he personally sold approximately 50 to 60 dime bags (5 to 6 grams) for Golden, and that on an average weekend, he sold 70 to 80 bags (7 to 8 grams). Nieto also testified that the most he ever sold in a day was 300 dime bags (30 grams). Flynn testified at trial that on an average weekend day, he would sell between 100 and 150 dime bags (10 to 15 grams). This was corroborated by police officers and undercover agents who testified that there was a high volume of traffic at the Hyslop Street building.

The trial testimony also demonstrated that drug sales remained consistent when the operation moved to the Jackson Street house. Reva testified that the same customers came to the Jackson Street house that had come to the Hyslop Street building. Alfaro also testified that he sold 298 bags (29.8 grams) on the day before the February 11, 1994 raid at the Jackson Street house. During the raid, Alfaro was arrested with $1310, or the proceeds from 131 bags (13.1 grams) on his person. Moreover, the record found in the trash behind the Jackson Street house evidenced the sale of 92 bags (9.2 grams) on one day.

 The district court's estimate of 2.5 kilograms is conservative in the face of this testimony. The district court took a low estimated daily sales figure (10 grams per day), multiplied it by the number of days the conspiracy was in effect (approximately 250), and came up with a total estimated distribution of 2.5 kilograms over the life of the conspiracy. This gave Golden a base offense level of 38, which is the offense level for distributing between 1.5 and 5 kilograms of cocaine base. That is, the district court's estimation could have been off by an entire kilogram, and Golden would still have fallen into the same base offense level.

Moreover, because we do not challenge the ability of the district court to hear and judge the credibility of witnesses, Golden faces an

uphill battle in attempting to convince us that we should disbelieve the witnesses at trial. We will not reweigh evidence and evaluate the credibility of witnesses because these are "tasks that lie outside our province." *United States v. Moutry,* 46 F.3d 598, 603 (7th Cir. 1995). We will instead leave the credibility judgment to the "sound discretion of the district court, which has the advantage of having observed the demeanor of the witnesses as they testified." *United States v. Campbell,* 985 F.2d 341, 347 (7th Cir.1993). Accordingly, we find that the district court did not err in attributing 2.5 kilograms of crack to Golden.

### C. *18 U.S.C. Sec. 924(c)*

Golden's final contention on appeal is that he was not "properly charged" with using a firearm in relation to a drug trafficking crime. Golden's five-line argument contends that he could not have been convicted on the firearm charge because: (1) he was not observed using a firearm; (2) a firearm was not found in his immediate possession or in reasonable proximity to him; and (3) the only reference to a gun comes from a co-defendant who claims that he bought the gun for Golden and claims that Golden gave that gun to another codefendant. Despite his failure to articulate the correct claim, we conclude that the crux of Golden's complaint is that there was insufficient evidence to convict him on the firearm charge.

Title 18 U.S.C. § 924(c) provides in relevant part: "Whoever, during and in relation to any crime of violence or drug trafficking crime ... *uses* or *carries* a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years...." 18 U.S.C. § 924(c) (emphasis added). In Count 6, Golden was charged with *using* a Lorcin .380 caliber semi-automatic pistol in relation to distributing crack on February 11, 1994, the day of the raid. Count 6 also charged Golden with aiding and abetting the use of a firearm in violation of 18 U.S.C. §§ 924(c) and 2. Title 18 U.S.C. § 2 punishes as a principal "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission" or "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States." 18 U.S.C. § 2. Aiding and abetting liability under 18 U.S.C. § 2 has been routinely applied in conjunction with 18 U.S.C. § 924(c) to convict individuals of "aiding and abetting in using or carrying a firearm." *United States v. Price,* 76 F.3d 526, 529 (3d Cir.1996) (citations omitted) (collecting cases).

The Government's theory on the firearm count apparently changed during the trial. In its opening statement, the Government indicated to the jury that Golden was "charged with *using* or *possessing* a firearm during and in relation to a drug trafficking crime." By the time of its closing statement, however, the Government argued that the jury should find Golden guilty of *using* or *carrying* the gun, and, more specifically, that the jury could also find Golden guilty of aiding and abetting Carlos Alfaro in *using* or *carrying* the gun. This position is problematic because the indictment only charged Golden with *using* the gun and not with *carrying* it.

Although Golden was not charged with carrying the .380 or with aiding and abetting another to carry it, the jury was given a standard aiding and abetting instruction, along with an instruction on "using" or "carrying" a firearm, which read in pertinent part:

> The phrase "uses or carries a firearm" means having a firearm, or firearms, available to assist or aid in the commission of the crime alleged in Count Five [a distribution count] of the indictment.
>
> In determining whether the Defendant used or carried a firearm you may consider all of the factors received in evidence in the case, including the nature of the underlying crime of drug trafficking alleged, the proximity of the Defendant to the firearm in question, the usefulness of the firearm to the crime alleged, and the circumstances surrounding the presence of the firearm.
>
> The Government is not required to show that the Defendant actually displayed or fired the weapon. The Government is required, however, to prove beyond a reason-

able doubt that the firearm was in the Defendant's possession or under the Defendant's control at the time that a drug trafficking crime was committed, and that the firearm facilitated or had a role in the drug trafficking crime.

There was no objection to this instruction at trial. Prior to the Supreme Court's recent decision in *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), this circuit had interpreted the "use" prong of § 924(c) very broadly, and we have little doubt that this instruction would have been upheld under our old law. *See, e.g., United States v. Robinson,* 96 F.3d 246, 250 & n. 9 (7th Cir.1996); *United States v. Holmes,* 93 F.3d 289, 291 (7th Cir.1996).

■■■ *Bailey,* however, held that "use" of a firearm for purposes of § 924(c) requires a showing of *"active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." —— U.S. at ——, 116 S.Ct. at 505. The Supreme Court rejected a test that focused on whether the firearm was accessible and in proximity to drugs or drug proceeds, and instead stated that the "active-employment understanding of 'use' ... includes brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." *Id.* at ——, 116 S.Ct. at 508.

Under *Bailey,* then, the instruction given in this case was erroneous because it did not compel the jury to find "active employment" of the firearm. In fact, we recently held that this exact jury instruction, absent the final phrase "that the firearm facilitated or had a role in the drug trafficking crime," was erroneous in light of *Bailey. See Holmes,* 93 F.3d at 291; *United States v. Baker,* 78 F.3d 1241, 1246 (7th Cir.1996); *see also Robinson,* 96 F.3d at 249–50 (finding a similar instruction, with a "facilitation" phrase, erroneous in light of *Bailey* ); *United States v. Thomas,* 86 F.3d 647, 650 (7th Cir.), *cert. denied sub nom, Story v. United States,* —— U.S. ——,

117 S.Ct. 392, 136 L.Ed.2d 307 (1996) (finding an instruction with a "facilitation" phrase erroneous in light of *Bailey* ).

At the outset, we note that neither party has addressed the issue of the jury instruction on appeal. However, we recently held that the recitation of an almost identical instruction was plain error. *Holmes,* 93 F.3d at 292.[4] In *Holmes,* as here, we initially determined that the jury instruction was erroneous in light of *Bailey.* We then determined that the error was clear and uncontroverted at the time of appeal and that no policy concerns counseled against reviewing the error on appeal. Finally, we indicated that the error affected the substantial rights of the defendant. We noted that although all errors in jury instructions do not require the reversal of a conviction, the defendant's rights were affected because the jury "could have based its verdict on a variety of factual predicates," some of which would have supported a conviction in light of *Bailey,* and some of which would not have. *Id.* at 293–94. The *Holmes* court summarized: "We therefore are confronted with a situation in which the record makes clear that there is sufficient evidence of guilt to support a verdict of guilty, but we cannot be sure whether the jury relied upon that evidence, or upon evidence that, although sufficient under the law at the time of trial, is clearly inadequate after *Bailey." Id.* at 294. The *Holmes* court therefore concluded that the instructional error was plain, and that Holmes was entitled to a new trial on the § 924(c) charge. *Id.* at 294–96. Because we, too, cannot be sure upon which evidence the jury based its guilty finding, we conclude that the jury instruction given in this case was also plain error, which allows us to address it here.

On appeal, Golden makes a general challenge to the firearm conviction, and does not challenge the jury instruction. However, *Robinson* recently informed us that our analysis of flawed jury instructions on firearm

**4.** The instruction given in *Holmes* was almost identical to the instruction given here. The only difference between the two instructions is that in the instant case, the instruction contained a final phrase, "and that the firearm facilitated or had a role in the drug trafficking crime" (emphasis added), which was absent in *Holmes.* However, the presence of this phrase still does not render the instruction here in conformity with *Bailey.* Neither "facilitating" nor "having a role" in a drug trafficking crime rises to the level of "active employment" required by *Bailey.*

charges is just as relevant to sufficiency of the evidence challenges as it is to jury instruction challenges. *See Robinson,* 96 F.3d at 250 (citing *United States v. Gonzalez,* 93 F.3d 311, 320 (7th Cir.1996)). Because we believe that Golden's argument essentially disputes whether the evidence presented at trial was sufficient to convict him under § 924(c), we will apply the framework we now use in examining flawed jury instructions.

In *Robinson,* we summarized how we should proceed in these cases:

> In cases such as this one, where the jury instruction on "use" was clearly flawed, whether a § 924(c)(1) conviction will be affirmed outright, reversed outright, or reversed and remanded depends upon the nature of the evidence presented at trial. The essential framework is as follows: (1) if all the firearms evidence presented qualifies as either active-employment "use" or "carry," we will affirm the conviction despite the bad instruction; (2) if none of the evidence presented qualifies as either active-employment "use" or "carry," we will reverse the conviction outright; and (3) if some of the evidence presented could qualify as either active-employment "use" or as "carry," but other firearms evidence presented exemplifies only possession or some other type of now-defunct, inactive "use," we will reverse the conviction and remand for a new trial, since we cannot be sure whether the jury convicted on the proper basis or the improper basis.

*Id.* (citations omitted). *See, e.g. United States v. Smith,* 80 F.3d 215, 221 (7th Cir. 1996) (remanding case for retrial in light of *Bailey* where no active-employment use was shown and evidence could support but did not compel a finding that defendant carried a firearm); *United States v. Baker,* 78 F.3d 1241, 1247 (7th Cir.1996) (affirming § 924(c) conviction although defendant did not use a firearm as required by *Bailey* because all evidence proved that defendant carried a firearm); *see also Holmes,* 93 F.3d at 296; *Thomas,* 86 F.3d at 651.

██ This is a case like *Smith, Holmes,* and *Thomas.* Because evidence of multiple firearms was introduced at trial, we cannot tell whether the jury verdict rested on an erroneous understanding of "use" or on the jury's belief that Golden or Alfaro "carried" the firearm. We *do* know with certainty that the evidence presented at trial in this case cannot properly be characterized as "active-employment" use of a firearm, as required by *Bailey.* Seniqueca testified that during the February 11 raid at the Jackson Street house, Alfaro had a firearm but that she did not know where he had gotten the gun. She also testified that she had seen firearms in her Jackson Street house and that Golden and Rodriguez had purchased them. She testified further that she had never seen Golden in possession of the guns. Rodriguez testified he had seen Golden with guns and that he had purchased two .380 Lorcins for Golden. Reva testified that she had seen guns in the Jackson Street house and at the house in which she lived, and that Golden carried a gun. Reva also testified that during the February 11 raid, she saw Alfaro with a gun. Alfaro told Reva that he got the gun from Golden for his protection. Reva also testified that Golden had offered her a gun to carry, but she refused it. The most relevant testimony came from Alfaro. He testified that he had seen Golden with the .380 Lorcin at the Hyslop Street building. He also testified that on three or four occasions, Golden gave him the gun to carry on his person, and that Golden told him to "ditch the gun and burn" if the police came. Alfaro testified that on February 11, the day of the raid, Golden had the gun in the morning, but later left it on the table in the Jackson Street house. Alfaro testified that later in the day on February 11, Seniqueca handed him the gun from the table and he gave her the "clip," which contained the bullets. He testified that when the police came, he threw the gun down on the porch.

This universe of "gun evidence" at best proves that Golden possessed a gun and *carried* it and that he encouraged Alfaro to *carry* it. Therefore, this evidence falls into the third category delineated by *Robinson.* Some of the evidence qualifies as proof of "carrying" a firearm, but, unfortunately for the Government, other evidence exemplifies only possession or some other type of now-

defunct, inactive "use." *See, e.g., Robinson,* 96 F.3d at 251. The dilemma, of course, is the one explained in *Gonzalez*: "[I]f the jury was instructed incorrectly with respect to one of the possible bases of conviction and there exists the possibility that the jury was misled by that error in the statement of the law, the verdict cannot stand." 93 F.3d at 320.. For example, using this instruction, the jury conceivably could have convicted Golden for "using" a firearm because it found that the firearm merely "had a role" in the drug trafficking crime, and not because it found "active employment" of the firearm.

One significant factor makes this case different from our recent § 924(c) cases. Normally, if the indictment charges the defendant with either "using" or "carrying" a firearm, and the jury is instructed on both grounds, the conviction will stand with the presence of one of the grounds despite the absence of the other. *See United States v. Evans,* 92 F.3d 540, 542 (7th Cir.1996) (citations omitted). In this case, the indictment only charged Golden under the "use" prong of § 924(c), alleging that Golden "did knowingly and unlawfully *use* a firearm, specifically a Lorcin, .380 caliber, semi-automatic pistol, ... during and relation to" distributing crack (emphasis added). The indictment never recited a charge under the "carry" prong of § 924(c). In our other cases dealing with this issue, the defendant was charged under *both* the "use" prong and the "carry" prong. *See, e.g., Gonzalez,* 93 F.3d at 317; *Thomas,* 86 F.3d at 650; *Smith,* 80 F.3d at 221. In those cases, we followed *Bailey*'s lead, reversing the firearm conviction and remanding for a jury to determine whether the defendant could be found guilty of "carrying" a firearm under § 924(c). *See, e.g., Bailey,* —— U.S. at ——, 116 S.Ct. at 509; *Gonzalez,* 93 F.3d at 323; *Thomas,* 86 F.3d at 651; *Smith,* 80 F.3d at 221. In *Gonzalez,* for example, the Government conceded that the instruction was erroneous, but argued that we should remand the case for retrial on the theory that the defendant "carried" the firearm. 93 F.3d at 319.

In this case, because Golden was not charged with "carrying" a firearm, we cannot follow that procedural path. The Tenth Circuit faced these unusual circumstances in *United States v. Wacker.* 72 F.3d 1453, 1464–65 & n. 8 (10th Cir.), cert. denied, —— U.S. ——, 117 S.Ct. 136, 136 L.Ed.2d 84 (1996). In *Wacker,* the court reversed some defendants' firearm convictions because no *Bailey* active-employment "use" could be found. The court, however, could not remand those counts for consideration of whether the defendants could nonetheless be liable for "carrying" a firearm under § 924(c) because, as in this case, the defendants were not charged under the "carry" prong. *Id.* So, we reverse the § 924(c) conviction because of the absence of *Bailey* active-employment "use," but we do not remand for consideration of whether Golden can be liable under the "carry" prong of § 924(c). Although this may be a "windfall" for Golden, as we said in *Robinson,* "it is the established price of what our justice system is willing to pay for a greater measure of certainty that a defendant was not unlawfully convicted." *Robinson,* 96 F.3d at 251.

### CONCLUSION

We AFFIRM Golden's convictions on Counts 1, 4, 5 and 7 through 11. In accordance with *Bailey,* we REVERSE the § 924(c) conviction.